UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 2 8 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| MARCA-TEL, S.A. DE C.V., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B 02 034 |
| vs. | § | |
| | § | |
| THOMAS K. GARNER; WESTEL, INC.; and | § | |
| WESTEL INTERNATIONAL, INC., | § | |
| | § | |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT OF PLAINTIFF MARCA-TEL, S.A. DE C.V.

Plaintiff Marca-Tel, S. A. de C. V. ("Marca-Tel") files this First Amended Complaint against defendants Tommy K. Garner ("Garner"); Westel, Inc.; and Westel International, Inc. (together, "Westel") (collectively, "Defendants").

## SUMMARY OF COMPLAINT

1.      Defendants Garner and Westel defrauded Marca-Tel of over $9.7 million in damages.  Marca-Tel is in the business of providing long-distance telephone service and owns a fiber-optic network in Texas and Mexico.  Westel is also in the long-distance telephone service business, with switching equipment and a customer base located in Texas.  Garner controls Westel because, on information and belief, he is the President of both Westel companies, and he and his wife are the only shareholders in Westel.  Marca-Tel began a business relationship with Garner and Westel in 1997, agreeing as part of that relationship that Westel would pay Marca-Tel a fee to carry certain "southbound" international long-distance traffic originating with Westel in the United States and terminating in Mexico.  Westel, at the time, indirectly owned 24.5% of Marca-Tel.

1

2.     Shortly after Marca-Tel and Westel began doing business in 1997, Garner became the chief executive officer of Marca-Tel. Garner then abused his position of power at Marca-Tel by devising a scheme for Westel to use Marca-Tel's fiber-optic network to carry long distance traffic for Westel without payment, and without Marca-Tel's knowledge or consent. Garner and his Westel companies made a substantial profit from this scheme because they collected all the customer payments for the additional long distance traffic, but never paid Marca-Tel for using its network to carry the traffic into Mexico. Having recently discovered Defendants' fraudulent scheme, Marca-Tel now sues for compensatory damages to recover the payments lost as a result of Defendants' fraud and breaches of contract, for restitution of Defendants' unjust enrichment, and for exemplary damages to punish Garner and Westel.

## PARTIES

3.     Plaintiff Marca-Tel is a Mexican corporation with its principal place of business in Monterrey, Nuevo Léon, Mexico.

4.     Defendant Tommy K. Garner is an individual who resides and has his place of business in Austin, Texas. He may be served at his place of business: 1122 Colorado St., Suite 107, Austin, Texas 78701.

5.     Defendant Westel, Inc. is a Texas corporation with its principal place of business in Austin, Texas. Westel, Inc. may be served via its registered agent for service of process Tommy K. Garner, 1122 Colorado St., Suite 107, Austin, Texas 78701.

6.     Defendant Westel International, Inc. is a Texas corporation with its principal place of business in Austin, Texas. Westel International, Inc. may be served via its registered agent for service of process Tommy K. Garner, 111 Congress Ave., Suite 600, Austin, Texas 78701 (or alternatively at 1122 Colorado St., Suite 107, Austin, Texas 78701).

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(2) because Plaintiff Marca-Tel is a citizen of a foreign state (Mexico), all Defendants are citizens of Texas, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over each Defendant because each Defendant is a resident and citizen of Texas, and each Defendant has substantial contact with Texas and conducts business in Texas. Defendant Tommy K. Garner resides and has his place of business in Austin, Texas. Defendants Westel, Inc. and Westel International, Inc. are both Texas corporations, and both have their principal place of business in Austin, Texas.

9.     Venue is proper in this Court under 28 U.S.C. §1391(a)(1) and (c). The Westel Defendants are Texas corporations deemed to reside in this District for venue purposes because they are subject to personal jurisdiction in Texas, and would be subject to personal jurisdiction in this District if it were a separate State. Westel does business in this District and has significant contacts with this District, including but not limited to 1) offices in McAllen, Houston and Corpus Christi; and 2) on information and belief, numerous customers in this District. Venue is also proper in this Court under 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to Marca-Tel's claims occurred in this District and a substantial part of the property that is the subject of this action is located in this District. For example, Marca-Tel owns fiber-optic lines in this District that carried all the Westel long-distance traffic at issue in this case.

## **FACTUAL BACKGROUND**

10.    Marca-Tel has been in the business of providing long distance telephone service, including international service, since 1997. Marca-Tel owns a fiber-optic network located in Mexico and Texas, and entered into a contract with the Mexican national telephone company, Teléfonos de México ("Tel-Mex"), giving Marca-Tel the right to carry long-distance telephone traffic in Mexico. In exchange for that right, the contract requires Marca-Tel to pay Tel-Mex a fee for each minute of long distance telephone service that Marca-Tel carries through its network.

11.    The Westel Defendants are also in the business of providing long-distance telephone service. On information and belief, Garner has been the President of both Westel Defendants since before January 1997, and Garner and his wife are the only shareholders. Westel owns switching equipment in Texas and has customers in Texas and elsewhere in the United States. Westel uses fiber-optic lines owned by third parties to carry its long-distance traffic. The pertinent third-party fiber-optic line running south from Westel's switching equipment connects with Marca-Tel's fiber-optic network in this District, and Marca-Tel's fiber-optic network located in this District then runs to Marca-Tel's switching equipment in Monterrey, Mexico.

12.    Marca-Tel and Westel began a business relationship in 1997. As part of their arrangement, Marca-Tel agreed to handle, for a fee, Westel's "southbound" international long-distance telephone traffic that originated in the United States (or elsewhere) and terminated in Mexico. This southbound traffic traveled from Westel's switching equipment in Austin to Marca-Tel's fiber-optic network in this District and then over the border to Marca-Tel's switching equipment in Monterrey. At the same time, Westel agreed to handle, for a fee, Marca-

Tel's "northbound" international long-distance traffic originating in Mexico (or elsewhere) and terminating in the United States.

13.     Marca-Tel and Westel agreed to use a particular fiber-optic path to carry the Marca-Tel/Westel long-distance traffic, known as the "Westel I trunk." Using the Westel I trunk, southbound international long-distance traffic traveled from Westel's switching equipment in Austin to Marca-Tel's fiber-optic network in this District and then over the border to Marca-Tel's switching equipment in Monterrey. In addition, Marca-Tel and Westel established a second fiber-optic delivery pathway for business between them, known as the "Westel II trunk." The Westel II trunk followed the same route as the Westel I trunk and passed through the same switching equipment. Marca-Tel and Westel agreed that the Westel II trunk would only be used for future expansion after the Westel I trunk had reached its maximum capacity for carrying international long distance traffic (projected at the time to occur in approximately 1999).

14.     In furtherance of this business relationship, Marca-Tel entered into a contract effective January 1, 1997, with Progress International, LLC ("Progress"), a company owned in part by Westel. The contract, titled International Interconnection Agreement (the "Interconnection Agreement"), is attached hereto as Exhibit A and incorporated herein by this reference. Defendant Garner signed the Interconnection Agreement on behalf of Progress and knew its terms.

15.     The Interconnection Agreement provided, in part, that Marca-Tel would handle "southbound" international long-distance telephone traffic from Progress that originated in the United States (or elsewhere) and terminated in Mexico. Conversely, Marca-Tel agreed to pay a fee to Progress to handle "northbound" international long-distance traffic originating in

Mexico (or elsewhere) and terminating in the United States. The rate to be paid by each party is set forth in the Interconnection Agreement.

16.    The Interconnection Agreement governs the way the parties sending and receiving calls pursuant to the agreement would collect the fees due to them. In part, it requires that each party sending and receiving calls prepare a notice to the other of the particulars of its usage of the network, including the number of calls, the number of minutes billed by that party, the settlement rate per billed minute, and the total amount due to the other party.

17.    In January 1997, Marca-Tel and Westel began to perform pursuant to the Interconnection Agreement. Westel sent its southbound international long-distance traffic from its switching equipment in Austin to Marca-Tel's fiber-optic network and then over the border to Marca-Tel's switching equipment in Monterrey. In addition, Westel prepared monthly reports to Marca-Tel regarding the number of southbound minutes that it sent via Marca-Tel's network on Westel I, and Marca-Tel invoiced Westel for those minutes, as provided by the Interconnection Agreement. Both Marca-Tel and Westel understood that Westel took these actions as an assignee of Progress's rights and obligations under the Interconnection Agreement.

18.    In the alternative, an implied contract was formed between Marca-Tel and Westel that contained the identical terms and conditions as those found in the Interconnection Agreement. Defendants knew that Marca-Tel would not have permitted Defendants to use its fiber-optic network without charge, and Defendants further knew that Marca-Tel expected to be paid for Westel's usage of the network pursuant to the fee structure set forth in the Interconnection Agreement.

19.    In January 1997, shortly after Marca-Tel and Westel began their business relationship and began to perform under the Interconnection Agreement, Garner was hired as the

Director General of Marca-Tel (a position equivalent to chief executive officer). Westel, at the time, indirectly owned approximately 24.5% of Marca-Tel. After he became the Director General of Marca-Tel, Garner and Westel embarked on a scheme to defraud Marca-Tel, and make a substantial profit, by using the Westel II trunk to carry additional Westel southbound long-distance traffic to Mexico. For approximately fifteen months, from 1997 through late 1998, Defendants used the Westel II trunk to carry additional Westel southbound long-distance traffic without payment to Marca-Tel and without the knowledge or consent of Marca-Tel.

20.    Garner and his Westel companies deliberately and fraudulently concealed the existence of their scheme to fleece Marca-Tel. Moreover, Defendants made repeated affirmative misrepresentations about the amount of Westel southbound long distance traffic being carried by Marca-Tel. The standard billing practice between Westel and Marca-Tel, consisted of Westel sending monthly statements to Marca-Tel representing the total amount of southbound traffic Westel sent through Marca-Tel's network. Marca-Tel then sent monthly invoices to Westel based on the total number of long-distance minutes reported by Westel. Marca-Tel relied on Westel for an accurate monthly report of the total traffic, and Defendants knew that Marca-Tel relied on the accuracy of Westel's reports because Garner was the Director General of Marca-Tel.

21.    Westel, however, did not accurately report the total amount of southbound long distance traffic it sent to Marca-Tel. Instead, at Garner's direction, Westel sent Marca-Tel false and fraudulent reports every month showing only the amount of southbound traffic carried on the Westel I trunk, but Westel did not include in its monthly totals any of the southbound long distance traffic carried via the Westel II trunk. Due to Marca-Tel's reliance on Westel's fraudulent reports, Marca-Tel invoiced Westel only for the traffic carried on the Westel I trunk,

and did not receive payment for any of the traffic carried via the Westel II trunk. Marca-Tel did not become aware of Defendants' unauthorized use of the Westel II trunk line, as described above, until less than four years before filing this lawsuit.

22.    In addition, Westel failed to pay Marca-Tel for the domestic long-distance traffic that Westel sent on Marca-Tel's fiber-optic lines via large customers or wholesalers located in Mexico. Defendants themselves created these customers and/or wholesalers, which included: ACM Consulting, S.A. de C.V. ("ACM"); Global Assessment, Inc. S.A. de C.V. ("GAI"); International Communications Telemarketing, S.A. de C.V. ("ICT"); and International Telecommunications Partners, S.A. de C.V. ("ITP"). Defendants knew that their use of Marca-Tel's network to send this traffic (hereinafter "domestic long-distance traffic") was valuable, and Defendants knew that Marca-Tel would expect payment for this service. However, Westel failed to pay for its use of Marca-Tel's network for this traffic.

23.    Further, Garner and Westel have failed to pay Marca-Tel for long-distance traffic, sold to customers as 1-800 or "toll-free traffic." Garner and Westel sent this toll-free traffic on Marca-Tel's network, Marca-Tel sent invoices to Westel for the traffic, and Westel has not paid Marca-Tel for traffic. Defendants knew that their use of Marca-Tel's network to send this toll-free traffic was valuable, and Defendants knew that Marca-Tel would expect payment for this service. However, Westel failed to pay for its use of Marca-Tel's network for this traffic.

24.    Garner and his Westel companies collected substantial profits from their schemes to defraud Marca-Tel and breaches of contract. Westel collected payments for international and domestic long-distance traffic directly from its customers, but did not report all the traffic to Marca-Tel, and did not pay Marca-Tel what Westel owed on the traffic. Marca-Tel, as a result of Defendants' fraudulent schemes and breaches of contract, suffered over $12.7

million in damages consisting of the lost payments Marca-Tel was entitled to receive for carrying the traffic, but never did receive. As part of these damages, Marca-Tel suffered an out-of-pocket loss in the approximate amount of $9.4 million because it was obligated to pay, and did pay, its usual contractual fee to Telefonos de Mexico ("Tel-Mex") for each minute of long distance traffic carried through the Westel II trunk, even though it never received any payment from Westel for the Westel II traffic.

25.    As a result of Defendants' scheme to defraud Marca-Tel, a criminal fraud action has been brought against Garner in Mexico.

### COUNT I – FRAUD (All Defendants)

26.    The preceding factual statements and allegations are incorporated by reference as though fully set forth.

27.    Defendants' conduct amounted to fraud on Marca-Tel by concealment of material facts. As Director General of Marca-Tel, Garner had the duty to disclose to Marca-Tel all material facts he knew about Marca-Tel's business operations. Garner, however, failed to disclose to Marca-Tel that he and his Westel companies were making unauthorized use of Marca-Tel's network via the Westel II trunk without paying Marca-Tel. On the contrary, despite his duty of disclosure to Marca-Tel, Garner used his position of power at Marca-Tel to make the scheme a reality and to fraudulently conceal Westel's unauthorized use of Marca-Tel's network via the Westel II trunk.

28.    Defendants' conduct also amounted to fraud on Marca-Tel by means of affirmative false representations of material fact. During the period of time when Garner served as the Director General of Marca-Tel, the billing system between Westel and Marca-Tel required Westel to send monthly statements to Marca-Tel setting forth the total amount of southbound

traffic Westel sent through Marca-Tel's network.  The parties agreed that Marca-Tel would then send monthly invoices to Westel based on the total number of long-distance minutes reported by Westel.  Defendants, however, did not accurately report the total amount of southbound long distance traffic sent to Marca-Tel.  Instead, at Garner's direction, Westel sent Marca-Tel false and fraudulent reports every month showing only the amount of southbound traffic carried on the Westel I trunk, but not including any of the southbound long distance traffic carried via the Westel II trunk.  Defendants knew these reports were false because they were actually using the Westel II trunk at the time the reports were sent to Marca-Tel.

29.    Defendants' unauthorized use of the Westel II line without payment was clearly material to Marca-Tel due to its financial impact on Marca-Tel.  Defendants' conduct deprived Marca-Tel of the appropriate payments for carrying the Westel II traffic over its network, while at the same time obligating Marca-Tel to make out-of-pocket expenditures to Tel-Mex for carrying the Westel II traffic.  Thus, rather than making a profit on the Westel II traffic, Marca-Tel incurred a significant loss because it paid substantial sums to Tel-Mex without being paid by Westel.

30.    Defendants knew and intended that, by virtue of their conduct, Marca-Tel would be induced to carry the Westel II trunk traffic through its network and pay the associated fees to Tel-Mex, without receiving payment from Westel.  Defendants knew that Marca-Tel would not allow them to use its network for free.   Therefore, Garner fraudulently concealed Defendants' use of the Westel II trunk line, and Defendants misrepresented the total amount of southbound traffic sent from Westel to Marca-Tel so that Defendants could make, and in fact did make, substantial profits from the Westel II traffic without paying for the use of Marca-Tel's network.

31. Marca-Tel actually and justifiably relied on Defendants' misrepresentations. Marca-Tel relied on Defendants' fraudulent monthly reports about the total southbound traffic sent to Marca-Tel, because Marca-Tel used these fraudulent reports as the basis for its monthly invoices to Westel. Defendants knew that Marca-Tel relied on the accuracy of Westel's reports as the basis for its billings. Marca-Tel's reliance was justified, because Marca-Tel relied on its U.S. partners for accuracy in its billings, and Garner was an indirect U.S. partner of Marca-Tel at the time as well as Director General of Marca-Tel.

32. Marca-Tel also actually and justifiably relied on Defendants' fraudulent concealment of the material fact that Westel was making unauthorized use of the Westel II trunk. Marca-Tel justifiably relied on Garner's silence and concealment of the fact that Defendants were making use of the Westel II trunk because Marca-Tel properly expected that Garner, as the Director General of Marca-Tel, would act in the best interests of Marca-Tel and disclose all material facts about Marca-Tel's business, including any use of the Westel II line. For the same reason, Defendants knew that Marca-Tel relied on Garner to disclose all material facts about Marca-Tel's business

33. Both Westel Defendants are liable to Marca-Tel for their own conduct, and are also vicariously liable for Garner's conduct under the doctrine of the vice-principal. At all pertinent times, Garner was a vice-principal of both Westel Defendants (on information and belief, the President of each company), and he acted within the scope of his authority as a vice-principal of Westel when he made use of the Westel II trunk without the knowledge or consent of Marca-Tel and directed that the false monthly statements be sent to Marca-Tel.

34. Both Westel Defendants are liable to Marca-Tel for their own conduct, and are also vicariously liable for Garner's conduct under the doctrine of *respondeat superior*.

At all pertinent times, Garner was an employee and agent of both Westel Defendants and he acted within the scope of his authority as an agent and employee of Westel when he made use of the Westel II trunk without the knowledge or consent of Marca-Tel and directed that the false monthly statements be sent to Marca-Tel.

35. Both Westel Defendants are liable to Marca-Tel for their own conduct, and are also vicariously liable for Garner's conduct under the doctrine of ratification, even assuming, contrary to law and fact, that Garner acted outside the scope of his authority from Westel when he made use of the Westel II trunk without the knowledge or consent of Marca-Tel and directed that the false monthly statements be sent to Marca-Tel. Both Westel Defendants approved Garner's conduct by participating in the scheme to use the Westel II trunk and accepting profits from use of the Westel II trunk without paying Marca-Tel. Both Westel Defendants knew about Garner's scheme, his concealment of the scheme from Marca-Tel, and his false representations in the monthly reports to Marca-Tel, and intended to validate Garner's conduct and benefit financially from it.

36. Defendants' fraud on Marca-Tel proximately caused Marca-Tel to suffer damages in excess of $9.7 million. Had Defendants informed Marca-Tel that they were using the Westel II trunk, Marca-Tel would not have allowed Defendants to use Marca-Tel's network for free. Defendants were only able to use the Westel II line for free to make substantial profits because Garner concealed this fact, Defendants misrepresented the total amount of southbound long distance traffic sent from Westel to Marca-Tel, and Marca-Tel relied on Defendants' silence and misrepresentations. As a result of Defendants' conduct, Marca-Tel was deprived of payment for carrying the Westel II traffic, but also paid Tel-Mex the mandatory fee for each minute of long distance traffic surreptitiously carried through the Westel II trunk.

37.    Marca-Tel seeks recovery of its actual damages from this fraud, in excess of $9.7 million, from all Defendants. Marca-Tel also seeks recovery of exemplary damages from all Defendants to punish them for defrauding Marca-Tel.

38.    Because Defendants are joint tortfeasors in their fraud on Marca-Tel, each Defendant should be held jointly and severally liable for all of Marca-Tel's damages, both actual and exemplary.

## COUNT II – AIDING & ABETTING FRAUD (Westel)

39.    The preceding factual statements and allegations are incorporated by reference as though fully set forth.

40.    Westel aided and abetted Garner's fraud on Marca-Tel, as previously described, and is therefore liable for Marca-Tel's damages resulting from the fraud. Westel directly and knowingly participated in, and materially aided and assisted, Garner's scheme to use the Westel II trunk without Marca-Tel's knowledge or consent, and without payment to Marca-Tel. The United States portion of the Westel II trunk traffic was routed through Westel's switching equipment in Austin. Moreover, Westel gained substantial profits from the use of the Westel II trunk by collecting payments directly from its long distance customers, but never paying Marca-Tel for any of the traffic.

41.    Westel knew that it was participating in a scheme to make use of the Westel II trunk without Marca-Tel's knowledge or consent, and intended to deceive and defraud Marca-Tel and/or assist Garner in deceiving and defrauding Marca-Tel so that Westel could gain substantial profits from the Westel II traffic. Alternatively, Westel had a general awareness of its role in the scheme to make unauthorized use of the Westel II trunk, and acted with reckless

disregard concerning whether Marca-Tel would be deceived by the Westel II scheme and Defendants' conduct.

42.     Westel aided and abetted Garner in perpetrating fraud on Marca-Tel by providing the instrumentality that made the fraudulent Westel II scheme possible, specifically Westel's switching equipment in Austin and the long-distance telephone traffic generated from its customers.   Therefore, Westel's conduct in aiding and abetting Garner's fraud was a proximate cause of damage to Marca-Tel, because Marca-Tel was deprived of any payment for the traffic carried through the Westel II trunk.

43.     Because the Westel Defendants aided and abetted Garner's fraud on Marca-Tel, the Westel Defendants should be held jointly and severally liable for all of Marca-Tel's damages, both actual and exemplary.

### COUNT III - CIVIL CONSPIRACY TO COMMIT FRAUD (All Defendants)

44.     The preceding factual statements and allegations are incorporated by reference as though fully set forth.

45.     Defendants' conduct and scheme constituted a conspiracy to defraud Marca-Tel.  Garner, in his capacity as Director General of Marca-Tel, acted together with agents and/or employees of the Westel Defendants for the purpose of using the Westel II trunk without the consent of Marca-Tel to make substantial profits, and also for the purpose of concealing this fact from Marca-Tel and sending false monthly reports to Marca-Tel that misrepresented the amount of southbound long distance traffic sent from Westel to Marca-Tel.  Garner and the Westel Defendants had a "meeting of the minds" about the object of their conspiracy, because each knew and intended that the goal of their concerted action was a scheme to use the Westel II

trunk without the knowledge or consent of Marca-Tel, and without paying Marca-Tel, thereby reaping substantial profits.

46.     Defendants overtly acted in furtherance of their conspiracy.  These overt acts include, but are not limited to, 1) using the Westel II trunk to carry "southbound" long distance traffic through Marca-Tel's network, 2) accepting substantial fees from their use of the Westel II trunk without paying Marca-Tel for the use of its network, and 3) sending false monthly reports to Marca-Tel that misrepresented the amount of southbound long distance traffic sent from Westel to Marca-Tel.

47.     Defendants succeeded in their conspiracy to defraud Marca-Tel, and made substantial profits by using the Westel II trunk to carry long-distance telephone traffic without Marca-Tel's knowledge or consent and without paying Marca-Tel.  Defendants' conspiracy proximately caused damage to Marca-Tel in an amount exceeding $9.7 million because it was deprived of payment for the Westel II traffic, but was required to pay, and did pay, its mandatory contractual fees to Tel-Mex for carrying the Westel II traffic.

48.     Marca-Tel seeks recovery of its actual damages, in excess of $9.7 million, from all Defendants.  Marca-Tel also requests exemplary damages against all Defendants to punish them for the fraud they perpetrated on Marca-Tel by means of their conspiracy.

49.     By virtue of each Defendant's participation in this conspiracy, each Defendant should be held jointly and severally liable for all of Marca-Tel's damages, both actual and exemplary.

## <u>COUNT IV – BREACH OF CONTRACT</u>

## (WRITTEN INVOICE AGREEMENTS)

### RE: DOMESTIC LONG DISTANCE TRAFFIC (Westel)

50.    The preceding factual statements and allegations are incorporated by reference as though fully set forth here.

51.    As described above, Defendants themselves created entities or wholesalers located in Mexico through which they would send domestic long-distance traffic, including ACM, GAI, ICT, and ITP.

52.    Marca-Tel and Westel agreed that Marca-Tel would permit Westel to send domestic long-distance traffic using Marca-Tel's fiber-optic network.  The parties agreed that Westel would pay Marca-Tel for this service.

53.    Each month, the parties evidenced their agreement through the preparation of written monthly invoices sent by Marca-Tel, based on the number of southbound domestic long-distance minutes that Westel sent via Marca-Tel's network.  Each invoice represented a separate contract requiring payment by Westel of the amount noted on the invoice.

54.    Westel breached the numerous written invoices by failing to pay for the domestic long-distance traffic it sent over Marca-Tel's network.  Demand has been made for the amounts due and owing, and Westel has failed to pay these amounts.

55.    Marca-Tel performed all of the obligations required of it under the invoices, including by permitting Westel to send domestic long-distance traffic over its network.

56.    As a result of Westel's breaches described herein, Marca-Tel was damaged in an amount exceeding $2.5 million.

## COUNT V – BREACH OF CONTRACT

## (WRITTEN INVOICE AGREEMENTS)

### RE: TOLL-FREE TRAFFIC (Westel)

57.     The preceding factual statements and allegations are incorporated by reference as though fully set forth here.

58.     Marca-Tel and Westel agreed that Marca-Tel would permit Westel to send toll-free telephone traffic using Marca-Tel's fiber-optic network.  The parties agreed that Westel would pay Marca-Tel for this service.

59.     Each month, the parties evidenced their agreement through the preparation of written monthly invoices by Marca-Tel based on Westel's monthly reports regarding the number of toll-free minutes that it sent via Marca-Tel's network.  Each invoice represented a separate contract requiring payment by Westel of the amount noted on the invoice.

60.     Westel breached the numerous written invoices by failing to pay for the toll-free traffic it sent over Marca-Tel's network.  Demand has been made for the amounts due and owing, and Westel has failed to pay these amounts.

61.     Marca-Tel performed all of the obligations required of it under the invoices, including by permitting Westel to send toll-free traffic over its network.

62.     As a result of Westel's breaches described herein, Marca-Tel was damaged in an amount exceeding $480,000.

### COUNT VI – BREACH OF IMPLIED CONTRACT/QUANTUM MERUIT

### RE: DOMESTIC LONG-DISTANCE TRAFFIC (Westel)

63.     The preceding factual statements and allegations are incorporated by reference as though fully set forth here.

64.    By permitting Westel to send domestic long-distance traffic via its fiber-optic network, Marca-Tel provided a valuable service to Westel. Westel affirmatively accepted and enjoyed the benefits of this service by sending domestic long-distance traffic over Marca-Tel's network. Westel knew that Marca-Tel expected to be paid for this service. Accordingly, an implied contract between Westel and Marca-Tel was formed, requiring Westel to pay to Marca-Tel for Westel's use of Marca-Tel's network to send domestic long-distance traffic.

65.    By failing to report and pay for the domestic long-distance traffic it sent over Marca-Tel's network, Westel breached this implied contract between the parties. A breach occurred each time Westel failed to report and pay for domestic long-distance traffic it sent over Marca-Tel's network.

66.    Marca-Tel performed all of the obligations required of it under the implied contract, including by permitting Westel to send domestic long-distance traffic over its network.

67.    By breaching the implied contract, Westel was unjustly enriched in an amount exceeding $2.5 million. Marca-Tel is entitled to restitution of these monies. Demand has been made for the amounts due and owing, and Westel has failed to pay these amounts.

## COUNT X – BREACH OF IMPLIED CONTRACT/QUANTUM MERUIT
## RE: TOLL-FREE TRAFFIC (Westel)

68.    The preceding factual statements and allegations are incorporated by reference as though fully set forth here.

69.    By permitting Westel to send toll-free traffic via its fiber-optic network, Marca-Tel provided a valuable service to Westel. Westel affirmatively accepted and enjoyed the benefits of this service by continuing to send toll-free traffic over Marca-Tel's network. Westel knew that Marca-Tel expected to be paid for this service. Accordingly, an implied contract

between Westel and Marca-Tel was formed, requiring Westel to pay to Marca-Tel for Westel's use of Marca-Tel's network.

70.     By failing to pay for the toll-free traffic it sent over Marca-Tel's network, Westel breached the implied contract between the parties.  A breach occurred each time Westel failed to pay for toll-free traffic it sent on Marca-Tel's network.

71.     Marca-Tel performed all of the obligations required of it under the implied contract, including by permitting Westel to send toll-free traffic over its network.

72.     By breaching the implied contract, Westel was unjustly enriched in an amount exceeding $480,000.  Marca-Tel is entitled to restitution of these monies.  Demand has been made for the amounts due and owing, and Westel has failed to pay these amounts.

## COUNT X – CONSTRUCTIVE TRUST (All Defendants)

73.     The preceding factual statements and allegations are incorporated by reference as though fully set forth.

74.     Because Defendants have committed fraud on Marca-Tel, and thereby obtained substantial financial benefit at Marca-Tel's expense, a constructive trust should be imposed on the funds Defendants received as a result of their fraud, with Marca-Tel as the beneficiary of the constructive trust.

75.     A constructive trust imposed on the fruits of Defendants' fraud is necessary and appropriate to prevent Defendants from being unjustly enriched, because they reaped substantial profits from the Westel II long-distance traffic, without paying Marca-Tel for the use of its network, in full knowledge that Marca-Tel would be forced to pay Tel-Mex for carrying the Westel II traffic.

76.     Marca-Tel therefore requests that this Court exercise its equitable power to impose a constructive trust on the funds obtained by Defendants as a result of their fraud described herein, and declare Marca-Tel the equitable owner of such funds.

### COUNT XI – CONSTRUCTIVE TRUST (Westel)

77.     The preceding factual statements and allegations are incorporated by reference as though fully set forth here.

78.     As a result of its numerous breaches of contract described herein, Westel is an involuntary constructive trustee of monies and assets belonging to Marca-Tel. Westel is also an involuntary constructive trustee with respect to any and all transactions involving, constraining, or affecting Marca-Tel's assets. Accordingly, Marca-Tel is entitled to have a constructive trust imposed upon $2.9 million worth Westel's stock, together with any and all issues, shares, dividends, interests, profits and income received at any time, or connected in any manner with the assets of Marca-Tel, by Westel or any acting with, for, or in concert with Westel. Such trust should be held for the benefit of Marca-Tel's shareholders.

79.     Marca-Tel therefore requests that this Court exercise its equitable power to impose a constructive trust on the funds obtained by Westel as a result of its breaches of contract described herein, and declare Marca-Tel the equitable owner of such funds.

### COUNT XII – FOR APPOINTMENT OF RECEIVER (Westel)

80.     The preceding factual statements and allegations are incorporated by reference as though fully set forth.

81.     As alleged herein, Marca-Tel is entitled to equitable relief as a remedy for the breaches alleged herein.

FIRST AMENDED COMPLAINT OF PLAINTIFF
                                                                              MARCA-TEL, S.A. DE C.V.

82.    Marca-Tel is informed and believes, and thereon alleges, that Westel possesses and controls assets belonging to Marca-Tel and its shareholders without the permission of Marca-Tel.  Marca-Tel is also informed and believes, and thereon alleges, that Westel has used or will use the assets of Marca-Tel, including its rights to profits, monies, and shares, to engage in conduct that will materially change said assets and Marca-Tel's ownership rights therein.

83.    Unless Westel is restrained during the pendency of this action and thereafter from dissipating said assets; or from encumbering, selling, pleading, converting or otherwise using said assets; or from acting in any manner that is materially adverse to Marca-Tel's interest in same, Marca-Tel will suffer irreparable harm from which there is no adequate remedy at law.

84.    Accordingly, the appointment of a receiver over Westel is necessary to maintain the status quo and avoid materials changes in Marca-Tel's property wrongfully held by Westel, including all interests and rights therein.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby requests a trial by jury.

### PRAYER

For the foregoing reasons, Marca-Tel requests that this Court, after trial, enter judgment in favor of Marca-Tel and against Defendants for:

i.    actual damages in excess of $12.7 million incurred by Marca-Tel as a result of Defendants' conduct;

ii.       benefit of the bargain damages in excess of $2.9 million, according to proof at

          trial, incurred by Marca-Tel as a result of Defendants' breaches of contract;

iii.      restitution;

iv.       exemplary damages;

v.        attorneys' fees;

vi.       costs;

vii.      prejudgment and post judgment interest;

viii.     imposition of a constructive trust on the funds Defendants gained as a result of

          their conduct described herein;

ix.       appointment of a receiver over Westel; and

x.        such other and further relief as is just.


Dated:         August 26, 2002.

                         Respectfully submitted,

                         BROBECK, PHLEGER & HARRISON LLP

                         By: _Edward F. Fernandes_ /by permission
                                                  Alexal P. Saenz

                             Edward F. Fernandes
                             Attorney in Charge
                             State Bar No.06932700
                             Southern District Bar No. 2638
                             4801 Plaza on the Lake
                             Austin, Texas 78746
                             (512) 330-4000
                             Fax (512) 330-4001

                         **ATTORNEY-IN-CHARGE FOR
                         PLAINTIFF MARCA-TEL, S.A.de C.V.**

OF COUNSEL:

Alexandra P. Saenz
State Bar No. 00797263
Southern District Bar No. 26812
BROBECK, PHLEGER & HARRISON LLP
4801 Plaza on the Lake
Austin, Texas 78746
(512) 330-4000
Fax (512) 330-4001

Sarah J. Barney
*Pro Hac Vice Application Pending*
California Bar No. 186391
BROBECK, PHLEGER & HARRISON LLP
550 S. Hope Street
Los Angeles, California  90071
(213) 489-4060
Fax (213) 745-3345

     and

James DeAnda
State Bar No. 05624000
Southern District Bar No. 15484
SOLAR & ASSOCIATES, LLP
Williams Tower
2800 Post Oak Blvd.
Suite 6300
Houston, Texas 77056
(713) 850-1212
Fax (713) 850-1199

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Amended Complaint was forwarded by certified mail, return receipt requested, hand delivery, Federal Express, fax, and/or United States Mail, First Class, on August 26 2002, to the following:

*VIA U.S. Mail, RRR*
Patton G. Lochridge
Carlos R. Soltero
McGinnis, Lochridge & Kilgore, L.L.P.
1300 Capitol Center
919 Congress Avenue
Austin TX 78701
Fax (512) 495-6093

*VIA U.S. Mail, RRR*
Mitchell C. Chaney
RODRIGUEZ, COLVIN & CHANEY, L.L.P.
1201 East Van Buren
Brownsville, Texas 78520
Fax (956) 541-2170

Alexandra P. Saenz

EXHIBIT "A"

# INTERNATIONAL INTERCONNECTION AGREEMENT



## I.    Service Definition and Interpretation

This Agreement, including Appendix A defines the terms and conditions under which Progress International, LLC (Progress) and MarcaTel, S.A. de C. V. (MarcaTel) agree to interconnect their respective telecommunications systems to jointly provide certain international telecommunication services between points in México and points outside of México.  Such services include, but are not limited to, International Long Distance (ILD) Message Telecommunications Service. These services may be changed or expanded by annexes to this Agreement signed by both parties.  All interconnection shall be under mutually agreed upon technical standards, performance standards and operating procedures.  Appendix A contains the rates for ILD Message Telecommunications Services, which may be amended from time to time to incorporate new rate schedules.

## II. General

A.  This Agreement has been written in the English language.  Should any dispute over the interpretation of this Agreement occur, the English language version shall prevail.

B.  The Comisión Federal de Telecomunicaciones  has the right to authorize the terms of this Agreement.

C.  According to the International Long Distance Rules published in the Federal Gazette by the Comisión Federal de Telecomunicaciones on December 11, 1996 (the Rules), the  following definitions apply to this Agreement:

1.  Commission shall mean the Comisión Federal de Telecomunicaciones, unless otherwise specified.

2.   A Call Attempt is any call delivered to a foreign operator, regardless of whether the call is completed.

---

*México-United States Telecommunications International Interconnection Agreement between MarcaTel, S.A. de C. V. and Progress International, LLC*

MTE 001536

3.   An International Port is a point where circuits are interconnected for the completion of international traffic.  The International Port must be approved by the Commission.

4.   The System of Rates for Uniform Settlement refers to those rates owed by the billing carrier to the non-billing carrier for the international circuit provided by the non-billing carrier, international gateway switching,  and domestic transport and termination in the foreign country.

    a.   The uniform settlement rates that are applied by the international port operator  to long distance calls coming from a specific country are independent of the carrier that originates the calls and independent of the concessionaire that terminates the calls in México .

    b.   The uniform settlement rates that are applied by the international port operator to long distance calls going to a specific country are independent of the carrier that terminates the calls and independent of the concessionaire that originates the calls in México.

5.   The Proportional Return System as defined under Rule 2.XIII. of the "Rules" is the one by which international port operators shall distribute the inbound call attempts to México in accordance with the following:

    a.   The total of settlements that have been paid by international port operators to carriers from a specific country within a one month period will be determined.

    b.   The percentage of all settlements that are generated by each international port operator within such period will be determined as described in paragraph "a" above.

    c.   International port operators will be entitled to receive, in a random form with respect to the type of call, the inbound call attempts originated from a specific country in any month according to the percentages established in the previous monthly period as described in paragraphs "a" and "b" above.



*México-United States Telecommunications International Interconnection Agreement*
*between MarcaTel, S.A. de C. V. and Progress International, LLC*

*Effective January 1, 1997*                                **MTE 001537**                **Page 2**

    d.  Thus, if an international port operator receives inbound traffic in a percentage higher than the number that corresponds to it as described in paragraph "c" above, such operator shall in random form (1) withhold the call attempts that correspond to it, and (2) distribute the call attempts in excess to each international port operator to satisfy the percentages indicated.

6.  The Settlement Rate is the one that:

    a.  An international port operator charges to a carrier when it receives traffic originated from a specific country.

    b.  A foregoing carrier charges to an international port operator when it receives traffic originated in México.

## III.  Routing of México - United States Traffic

A.  Traffic shall only be handled through International Ports approved by the Commission.

B.  The initial physical interconnection point for the ILD Services shall be at the IXC Communications, Inc. terminal in McAllen, Texas.  Interconnection points may be changed from time to time to incorporate new points of interconnection, or to change points of interconnection for the provision of the ILD Services.  For settlement purposes, the points of interconnection shall also be considered the border pricing points.  Traffic sent to a country with which México has no common border could be sent directly, or through an intermediate country; but, for purposes of the Proportionate Return System, the traffic will be considered as if sent via the intermediate country. Refer to Rule No. 39 of the "Rules."

## IV.  Routing of Other International Traffic

All other international traffic shall be routed under Section III. A. preceding.   The rates for termination of all other international traffic shall be those in Appendix B.

## V. Responsibilities of Parties



*México-United States Telecommunications International Interconnection Agreement*
*between MarcaTel, S.A. de C. V. and Progress International, LLC*

MTE 001538

A.    Each party to this Agreement acknowledges that it is responsible, at its own expense, to arrange for the necessary connection of its telecommunications system with any connecting companies in its operating territory to facilitate the orderly operation of the ILD Services.

B.    Progress shall provide, or ensure the provision of, ubiquitous originating or terminating connections for the Message Telecommunications Services, in the 48 contiguous states of the United States and other international locations outside of México.

C.    MarcaTel shall provide, or ensure the provision of, ubiquitous originating or terminating connections for the Message Telecommunications Services, in México.

D.    Each party shall advise the other party of any system failure that is expected to cause interruption of any or all of the Message Telecommunications Services hereunder between México and the United States which arises from any cause occurring within its operating territory in accordance with mutually agreed upon technical standards, performance standards, and operating procedures.

E.    All interconnection shall use standard BellCore SS7 signaling arrangements.

F.    Progress shall provide international operator services at rates to be determined later.


VI.    **Accounting And Revenue Settlement**

The long distance concessionaire that has the largest percentage of the long distance market for outgoing calls for the previous six months prior to negotiations, shall negotiate the settlement rates with the carriers of that specific country.  These rates shall be submitted to the Commission for approval.  Refer to Rule No. 13 of the "Rules."   The settlement arrangements which shall apply for the Message Telecommunications Services provided for under this Agreement are detailed in Appendix A to this Agreement.  Revenues for ILD shall be billed by the company serving the party originating the call under its tariffs or price lists, and shall be shared with the terminating company as agreed below.

*México-United States Telecommunications International Interconnection Agreement*
*between MarcaTel, S.A. de C. V. and Progress International, LLC*

*Effective January 1, 1997*                                MTE 001539          Page 4

## VII.    Settlement Payments

A.    Traffic associated with Message Telecommunications Services provided under this Agreement shall be reported separately on the monthly settlement statement of accounts.  Settlement payments are based upon total minutes for the month, not on call by call basis.

B.    Settlement payments shall be made monthly in accordance with this section, as modified from time to time where necessary to use and apply the settlement rates and structure in Appendix A to this Agreement.

C.    Each party shall prepare a monthly notice including the following information:  the number of calls; the number of minutes billed by that party; the settlement rate per billed minute; and, the total amount due to the other party.  Each party shall forward the monthly notice to the other party as soon as practicable after the calendar month to which the notice relates.  A party may reject and return a monthly notice that does not contain complete and accurate information as required by this Agreement together with a written explanation of the reasons for the rejection.

D.    Each party shall be responsible for its own uncollectibles.

E.    Each party may deduct from its monthly notice credits for defective transmission periods, or for such other reasons as may be mutually agreed upon in writing by the parties, provided that the agreement is made prior to the date that the notice for the month involved is forwarded to the other party.

F.    Each party shall prepare monthly statements regarding outgoing collect and credit card calls which shall be included in the monthly notices.  Such monthly statement shall be either in the form of collect tickets or lists that, at a minimum, contain the following information:  date of the call, calling party national number, called party national number, type of call (collect or credit card), credit card number or billed number; basis of charging (full, reduced, personal or station); duration in minutes; time of connect (hour and minute).  These statements shall be transmitted promptly to the party that will be collecting the charges, but in no event later than the end of the third calendar



*México-United States Telecommunications International Interconnection Agreement between MarcaTel, S.A. de C. V. and Progress International, LLC*

*Effective January 1, 1997*                    **MTE 001540**           Page 5

month following the month after the collect or credit card call occurred. Failure to transmit these statements in a timely manner may, at the discretion of the receiving party, result in such collect or credit card calls being deducted from the settlement process.

G.    Each party shall maintain all records necessary to substantiate all monthly notices for a period of three years. Each party shall make its accounting and settlement records and call detail data available for inspection by the other party.

H.    The sums due each month from one party to the other, as stated in the monthly notices shall be reduced to a net balance by each party. No monthly amounts shall be due and owing from either party to the other until the amounts credited to each party in the monthly notices rendered by both parties are netted against each other to determine a single monthly balance due.

I.    Net balances due shall be paid by the debtor party to the creditor party no later than five (5) business days after the monthly balance is calculated and the monthly notice properly rendered. This true-up shall be in accordance with Rule 23.V. of the "Rules." Net balances shall be paid by wire transfer.

J.    Net balances due that are not paid within the time frame specified in the previous paragraph shall accrue extended payment charges from the day following the day on which the payment was due until paid. For the purposes of this Agreement, extended payment charges shall be equal to 125 percent of the lowest publicly announced prime rate or minimum commercial lending rate of Citibank, N.A., New York City, or Chase Manhattan Bank N.A., New York City, on the day following the date payment of the bill was due. If applicable law does not allow extended payment charges established under this paragraph, then extended payments charges shall be the highest rate permitted by law. For the purposes of this Agreement, "paid" shall mean that the funds are available for immediate use by the payee.

K.    Settlement payments shall be payable in U.S. dollars.



*México-United States Telecommunications International Interconnection Agreement between MarcaTel, S.A. de C. V. and Progress International, LLC*

## VIII. Proportionate Return Allocation

Proportionate return calculations shall be based upon international direct distance dialed (IDDD) and operator traffic without collect minutes only, excluding minutes for 800 and Country Direct traffic. The operators of the international gateway will distribute call attempts incoming to México according to the following:

1. Each month the total settlement paid by all of the operators to all carriers of a certain country will be determined.

2. The percentage of total settlement generated by each of the operators in each period will be determined.

3. The subsequent month, operators will have the right to receive the incoming call attempts sent by a certain country as a function of the percentages established in the previous monthly amount, according to paragraphs 1 and 2 above.

4. The operator that receives incoming traffic more than the percentage corresponding to the terms above will be able to (1) retain call attempts that it is sent and (2) distribute disproportionate call attempts to each one of the other operators to satisfy the indicated percentages.

5. Under Rule 41 of the "Rules," by the 14th day of each month each international port operator shall submit to the Committee defined in Rule 2.III. of the "Rules," the following information for the preceding month:

   a. Total volume of inbound and outbound minutes.

   b. Total revenues for inbound and outbound traffic.

   c. Any other information the Commission considers necessary under Rule 8 of the "Rules."

6. Under Rule 42 of the "Rules," by the 14th day of each month each international port operator shall submit to the Committee defined in Rule 2.III. of the "Rules," the settlements for the previous month that were associated with its foreign correspondent.

## IX. Assignment

No assignment of this Agreement, or any rights thereunder, by either party, or any

*México-United States Telecommunications International Interconnection Agreement between MarcaTel, S.A. de C. V. and Progress International, LLC*

subsequent permitted assignee, shall be valid without the written consent of the other party. Such consent shall not be unreasonably withheld, but shall not be granted unless the assignee agrees to undertake the obligations contained in this Agreement, Appendix A and any subsequent modifications to either document. However, nothing in this paragraph shall restrict the right of any party to sell, assign, transfer or dispose of its rights or obligations under this Agreement to a legal successor or a subsidiary of, or a corporation or entity controlling or under the same control of such party, in which case due written notice shall be given in a timely manner.

## X. Changes and Modifications

This Agreement and any of its provisions may not be altered or changed except by agreement in writing signed by a duly authorized person on behalf of each party

## XI. Term and Termination

A.   This Agreement shall be for an initial term of seven years beginning on January 1st, 1997 and ending on December 31, 2003, and shall automatically continue from year to year unless terminated by either MarcaTel or Progress by written notice given at least one year before the effective date of termination.   In the event of a disagreement between the parties to this Agreement, the dispute may be mediated or arbitrated under an alternative dispute resolution process.   Service shall continue and not be interrupted during the period that the dispute is in the alternative dispute process.   Refer to Rule 23.VII. of the "Rules." However, in no case shall the term of this Agreement conflict with lender requirements for money loaned to MarcaTel for the purchase of facilities necessary to implement this Agreement.

B.   For purposes notification for termination, the addresses of the parties shall be as follows, unless otherwise designated in writing by the respective parties:

| Progress International, LLC | MarcaTel, S.A. de C. V. |
|---|---|
| 5000 Plaza on the Lake | Ave. San Jerónimo 210 Pte |
| Suite 200 | Col. San Jerónimo C.P. 64640 |

*México-United States Telecommunications International Interconnection Agreement*
*between MarcaTel, S.A. de C. V. and Progress International, LLC*

Austin, Texas 78746                 Monterrey, N.L., México

C.    The parties agree that no notice of termination under paragraph A above can be given prior to the first anniversary of the execution of this Agreement.

D.    MarcaTel shall not have any right to terminate this Agreement as a result of any act, or failure to act, by MarcaTel. Progress shall not have any right to terminate this Agreement as a result of any act, or failure to act, by Progress.

E.    Without prejudice to any other rights the parties may have, prior to the effective date of termination, Progress or MarcaTel shall have the right to suspend the provision of any Message Telecommunications Services in the event that it is entitled to terminate this Agreement for breach, provided that the breach relates to the Message Telecommunications Services which Progress or MarcaTel proposes to suspend, subject to the use of alternative dispute resolution under paragraph "A" above

## XII.   Termination of the Agreement

A.    In the event that any other provisions of the Agreement or its Appendix A are terminated prior to the termination of this Agreement, all of such provisions of the Agreement required to implement and maintain in force the Message Telecommunications Services identified in this Agreement, as they apply to support the continued provision of ILD Message Telecommunications Services, with all the necessary changes in points of detail, such that matters or things remain generally the same, but to be altered when necessary as to allow this Agreement to survive and be operative until such time as this Agreement is terminated in its entirety.

B.    If any of the provisions of this Agreement or its Appendix A shall be invalid or unenforceable, such invalidity or non-enforceability shall not invalidate or render unenforceable the entire Agreement, but rather the entire Agreement shall be construed as if not containing the particular  invalid or unenforceable provision or provisions, and the rights and obligations of the parties shall be construed and enforced accordingly.



*México-United States Telecommunications International Interconnection Agreement between MarcaTel, S.A. de C. V. and Progress International, LLC*

## XIII. Government Approvals

The performance of this Agreement by the parties is contingent upon the continued operation of the facilities, and upon the obtaining and continuance of such approvals, consents, governmental authorizations, licenses and permits as may be required or deemed necessary by the parties, and as may be satisfactory to them. The parties shall use all reasonable efforts to obtain and continue, and to have continued, such approvals, consents, licenses and permits.

**IN WITNESS HEREOF,** the parties hereto have executed this Agreement effective as of January 1st, 1997, by the hands of their respective duly authorized officers in that behalf.

**For Progress International, LLC:**

Signature: _____

Name:        Tommy K. Garner

Title:        Attorney in Fact

Date:        January 1st, 1997

**On behalf of MarcaTel, S.A. de C. V.:**

Signature: _____

Name:        César Eduardo Santacruz Polendo

Title:        Attorney in Fact

Date:        January 1st, 1997

---

*México-United States Telecommunications International Interconnection Agreement between MarcaTel, S.A. de C. V. and Progress International, LLC*

*Effective January 1, 1997*          **MTE 001545**      **Page 10**

Appendix A, Settlement Rate Schedule

SETTLEMENT RATE SCHEDULE BETWEEN MARCATEL, S.A. de C. V. AND PROGRESS INTERNATIONAL FOR PERIOD BEGINNING 1/01/97 AND ENDING 12/31/97

The following settlement arrangements shall apply for International Long Distance Services provided for in this Agreement after such rates have been approved by the Commission under Rule 23.VIII. and are in accordance with Rule 23.IX. of the "Rules:"

**International Long Distance (ILD) Service:**

ILD calls are those long distance message telecommunications consisting of dialed station-to-station direct or operator assisted person-to-person calls originated by a party in one country, the calling party, and terminated to a party in the other country, the called party.

**Part I:**        **México Terminated Traffic**

When MarcaTel is the terminating party in México, Progress shall compensate MarcaTel as follows:

| MarcaTel, S.A. de C. V. Rate Band | Dial Day ($US) | Dial Night ($US) |
|---|---|---|
| 1 | $0.26 | $0.186 |
| 2 | $0.52 | $0.371 |

**Part II:**        **United States Terminated Traffic**

When Progress is the terminating party in the United States, MarcaTel shall compensate Progress as follows:

| Progress International Rate Band | Dial Day ($US) | Dial Night ($US) |
|---|---|---|
| 1 | $0.271 | $0.194 |
| 2 | $0.580 | $0.414 |



*México-United States Telecommunications International Interconnection Agreement between MarcaTel, S.A. de C. V. and Progress International, LLC*

*Effective January 1, 1997*                    MTE 001546                    **Page 11**

Appendix A, Settlement Rate Schedule

**Part III:      Applicable to Both México and United States Terminated ILD Traffic**

| MarcaTel, S.A. de C. V. Rate Band | Rate Band Foundation | Kilometers | Equivalent Miles |
|---|---|---|---|
| 1 | 1 | 0 - 25 | 0 - 15.5 |
| | 2 | 25.1 - 75 | 15.6 - 46.5 |
| | 3 | 75.1-150 | 46.6-93 |
| 2 | 4 | 150.1-350 | 93.1-217 |
| | 5 | 350.1-550 | 217.1-341 |
| | 6 | 550.1-800 | 341.1-496 |
| | 7 | 800.1-1100 | 496.1-682 |
| | 8 | 1100.1 and over | 682.1 and over |

U.S. NPAs 619, 520, 602, 505, 915, 210, 714 and 512 equal Progress Rate Band 1. All remaining U.S. NPAs not listed above equal Progress Rate Band 2.

The above rates apply to the following ILD services: direct dial, station-to-station, person-to-person, country direct, collect and credit card. Settlement for all traffic will be on rounded whole minutes per message.

A $2.00 (U.S.) surcharge applies per received collect message that uses one or more of the following services when the ticketing is performed at the originating location: person-to-person collect, station-to-station collect.

For operator station, dial person collect and person-to-person calls a three (3) minute minimum charge at the dial day rate shall apply for each message. Dial day rates apply on all additional minutes.

A separate call setup surcharge of 30 seconds per message will apply on home country direct calls.

Dial day rate period is defined as Monday through Friday 7:00 am to 7:00 pm, and Sunday 5:00 pm to 12:00am. Dial Night rate period is defined as Monday through Friday 7:00pm through 7:00am, all day Saturday, and Sunday 12:00am to 5:00pm.

The period of the call shall be determined by the start time of the call at the originating location.

*México-United States Telecommunications International Interconnection Agreement*
*between MarcaTel, S.A. de C. V. and Progress International, LLC*